**THOMPSON v. AFRO–AMERICAN CO.**
**et al.**

**Civ. No. 3666.**

United States District Court
D. Maryland.

Aug. 29, 1950.

Paul Berman and Sigmund Levin, of Baltimore, Md., and Carson DeWitt Baker, of New York City, for plaintiff.

Harry O. Levin and Marshall A. Levin, of Baltimore, Md., and George E. C. Hayes, of Washington, D. C., for defendant.

COLEMAN, Chief Judge.

At the outset, the Court wants to allude to two points which have been important in the case and on either one of which the Court might perhaps have dismissed this suit.

First is the question of the plaintiff's citizenship, namely, whether there has been in fact adequate proof of the plaintiff having been a citizen of the State of New York at the time the suit was filed, so as to provide the diversity of citizenship requisite to this Court's jurisdiction.

Second, is the question whether, in any event, plaintiff's rights which are at issue here had been previously adjudicated by litigation in the Circuit Court No. 2 of Baltimore City, and thereby had become res adjudicata.

When these two points were originally raised and fully argued, this Court concluded that while at least the first one, namely, that of jurisdiction, presented a rather close factual point, nevertheless the complaint should not be dismissed on either ground, but that all the facts should be fully heard. After hearing the case fully on its merits, the Court is not disposed to change its view with respect to these two points. However, the Court finds that, on the evidence, for the reasons herein

fully stated, the complaint must be dismissed.

This is a suit founded upon allegations of gross fraud. More specifically, the objects of the suit are as follows, as set forth in the amended bill of complaint:

First, to set aside the sale which the plaintiff made to defendants of forty shares of stock in the defendant corporation, the Afro-American Company, plaintiff having acquired these shares under the will of his grandfather, plaintiff asserting, (a), that he was induced to part with this stock by fraudulent representations made to him by the individual defendants to the effect that he was not in fact selling the stock to them, but that it was being transferred to them merely as security for a loan to him of $1200; and (b), that the transaction, if in fact a sale, constituted a breach of trust in that two of the individual defendants, John H. Murphy, Jr., and David W. Arnett Murphy, as surviving trustees under the will of John H. Murphy, Sr., were personally interested in the stock and failed to disclose to the plaintiff, who was one of the beneficiaries under the will, either their interest or the true value of the shares transferred, and further that the transfer was for a grossly inadequate consideration, namely, $30 a share.

The second object of the suit is to secure an accounting and reimbursement to the plaintiff for the alleged wrongs done him by the defendants as trustees in breaching the trust.

The third object is to secure an accounting for the alleged wrong committed by the individual defendants as officers and directors of the corporate defendant, the Afro-American Company, against the plaintiff as a stockholder in that company.

The Court finds the following facts clearly and definitely established by the weight of the credible evidence. The plaintiff is 45 years old. For 16 years he worked for the defendant company. In 1929 he moved to New York for the purpose of taking a course in linotyping so that he might return to the defendant company in Baltimore and be better able to advance in its employ-ment. In 1930, while still residing in New York, and being hard up for funds, he communicated with three of the individual defendants, George, Carl and Arnett Murphy, his uncles, asking them for information as to what his forty shares of stock in the defendant company were then worth and whether he could dispose of them for the purpose of obtaining funds whereby he might continue his technical education in New York. As a result, plaintiff was invited to come to Baltimore to discuss the matter with his uncles. They read to him the provisions of his grandfather's will, by virtue of which he had acquired the forty shares of stock in the defendant company, and he was advised by them not to dispose of his stock. However, he insisted upon doing so, and after a good deal of discussion and further correspondence he still maintained that he wanted to sell the shares.

It is plaintiff's position that throughout the negotiations had with his uncles it was merely a loan which he asked for and intended to obtain, and thought he had obtained, and not a sale of his stock. However, his uncles all testified to the contrary, namely, that the question of lending the plaintiff money on his stock was not considered by them or by the plaintiff, and that their entire negotiations related to an outright purchase of the plaintiff's forty shares.

Since the two surviving trustees under the trust had been merely passive and had utilized the corporate defendant to handle the stock under the trust, i. e., to make any transfers thereof, and to disburse dividends thereon, etc.; and because, by the trust, there were restrictions imposed against the stock's acquisition by other than members of the Murphy family, the trustees laid before the board of directors of the company in September, 1930, the question of acquiring plaintiff's stock. It was thereupon agreed by them that the company should buy this stock for $30 a share, the total purchase price, namely $1200, to be paid in installments of $33 a month, except that the first payment, to be made at the time the contract was executed, should consist of four such installments. This method of payment was provided because it was felt

by the defendants that the plaintiff was not careful in his spending. What they really feared was that, being hard up and rather improvident, the plaintiff might dispose of his stock to someone outside of the family, which would be contrary to the close family corporation which the testator, plaintiff's grandfather, had expressly provided for in his will. Whether such was a wise thing to have done is not a material question here. But it is a fact, as appears clearly from the provisions of the will, and the manner in which the defendants were operating the newspaper company.

The contract with the plaintiff for the purchase of his stock was embodied in a formal agreement dated December 27, 1930, which the plaintiff and the trustees of the defendant company each personally signed. There was also executed simultaneously a paper whereby the trustees sold the stock to the defendant company. Proper receipt was given to plaintiff for the stock and the installment payments were regularly and fully made. When the full amount of $1200 had been paid to plaintiff in May, 1933, he signed a formal written receipt to this effect, which recited that he had received full payment for forty shares of Afro-American Company stock. At this time the plaintiff was again residing in Baltimore and working for the defendant company, he having returned the previous year.

Until 1941, the plaintiff never raised with any of the individual defendants any question concerning the stock which he had transferred in 1930, that is, not until eleven years later, when he asked his uncle, Carl Murphy, then president of the defendant company, what had become of the dividends on his stock, saying that he had understood the stock had been transferred merely in connection with a loan which the company made him. The plaintiff thereupon was informed by his uncle that such was not so —that he had made an out and out sale of his stock, and that the terms of his written agreement were expressly to that effect. The same information was given him by his other relatives, who had either actively participated in, or approved of the execution of the agreement in 1930. Thereupon,

plaintiff let the matter drop, and three years later, in 1944, he went back to New York to work, where he remained until 1949.

In 1946 the individual defendants who were trustees under their father's will filed a bill of complaint in the Circuit Court Number 2 for Baltimore City, seeking a construction of the provisions of the will, with respect to the trust therein provided for. All of the living beneficiaries under that trust who were still owners of the defendant company's stock were named as defendants. The plaintiff, however, was omitted as a defendant in this suit, since he had disposed of his stock in the company by the formal agreement of 1930. While still residing in New York, the plaintiff, upon hearing of this suit, employed an attorney to look into the matter. As a result, he petitioned for leave to intervene therein on the ground that he had not sold his stock and was still a beneficiary under the trust. The equity court permitted plaintiff to do so, but, thereafter, the trustees being heard in opposition thereto, the equity court rescinded its order allowing intervention but gave the plaintiff an opportunity within thirty days to file a bill of complaint in a court of appropriate jurisdiction, for the purpose of having his status with respect to the stock adjudicated. Plaintiff, however, did not take advantage of this opportunity so given him, but instead, filed a suit in the Supreme Court in New York City in December, 1946, against the Afro-American Company alone, seeking substantially the same relief that he is seeking in this present suit. This New York suit was dismissed in January, 1947, for want of jurisdiction over the defendant company in New York, and no appeal was ever taken.

In February, 1947, the Circuit Court Number 2 in Baltimore handed down its opinion to the effect that the alleged trust under the will of Murphy, Sr., was not in fact a valid one, being merely a dry trust of indeterminate duration. Accordingly, the Court ordered transfers of the stock purported to be held under the trust to be made directly to the respective beneficiaries. Since the plaintiff had been excluded from this equity proceeding and had

failed to take advantage of the opportunity afforded him to have his claim as a beneficiary adjudicated in a separate suit, the matter, in so far as he was concerned, had become res adjudicata in the Baltimore Courts.

The plaintiff never received, and never asked for any financial statement from the defendant company. He never knew what dividends were being paid after entering into the agreement of 1930, and never inquired with respect to same except, as previously stated, in 1941, the reason which he gave being that he reposed great confidence in his uncles and therefore assumed that they would treat him fairly and that he would ultimately have his stock returned, although he made no complaint whatsoever that this had not been done and no request other than as already stated that it be done, until the bringing of the present suit, which was filed in July, 1947.

In 1941, that is, approximately eight years after the plaintiff had receipted for the full payment of the $1200 for his stock, plaintiff asked his uncle Carl if he could buy his stock back. The latter explained that this was not possible because it had been purchased by the family, but stated that he, the uncle, would endeavor to see whether some other shares of the company's stock might be available for him to purchase, if he so desired. However, this was not further pursued by plaintiff.

■ The Court concludes from the foregoing facts which it finds established by the unquestioned weight of the credible evidence, that there is absolutely no basis for plaintiff's claim that he merely intended to obtain a loan and not to sell his stock, or that he was deceived into doing the latter by the fraudulent misrepresentations of his relatives. The plaintiff, in testifying, gave every evidence that he is now, and was in 1930 when he entered into the transaction with his relatives, being then 25 years old, a man of fair education and considerable intelligence. He had gone through the eighth grade in school. The plaintiff has not shown, either through his own testimony or that of any witnesses on his behalf, that he did not at all times fully

understand just what he was doing with respect to his stock, and what would be the effect thereof. There is no evidence that he was induced to part outright with it by any false representations or undue influence of any kind.

■ As already stated, it is very clear that the Murphy newspaper business was a close family affair, and that the plaintiff's uncles were fearful lest, if they did not acquire all of the defendant company's stock, it might get into the hands of persons who might be antagonistic to the development of the business as they wanted to develop it as a family affair, and as they understood they had a mandate to do under the will of John H. Murphy, Sr. Also, it is clear to the Court that even if we assume there was a technical breach of trust on the part of the trustees in acquiring for themselves stock from the plaintiff, one of the beneficiaries, nevertheless, under Maryland law there may well be instances where such is not forbidden, and where even if it is, the acquisition is merely voidable, not void.

Next, we must consider the important question of laches and acquiescence. Even assuming there was no breach of trust; or assuming that the trust was still in existence when plaintiff parted with his stock because not yet declared null and void or terminated by decree of the equity court in Baltimore; or assuming that here was a clear case of the plaintiff, being fully aware of what he had done and what were his rights, had waited too long before asserting them and that therefore he should be precluded from now claiming, at this late date, that the defendants have been guilty of a breach of trust and calling for an accounting to him, we turn then to the only remaining question in the case, which is this: Is there any substance to plaintiff's claim that even though this Court should find, as it does, for the reasons just given, that the plaintiff, intentionally and without any undue influence being brought to bear upon him, sold his stock to his relatives for $30 a share, nevertheless, this price was inadequate and plaintiff was led by his relatives into believing that it was adequate,

with the result that it would be unconscionable, even at this late date and apart from any other questions in the case, to preclude the plaintiff from redress to the extent of having the Court determine what would have been a fair price for the stock in 1930, and requiring the defendants to pay the plaintiff the difference between that price and what he actually received?

We find with respect to this aspect of the case that the weight of the credible evidence establishes beyond any question the following material facts: The fair value of the defendant company's stock on December 27, 1930, when the contract was made with the plaintiff for the sale of his forty shares, was between $20 and $30 a share, because at that time, based on the net quick assets value of the company, the stock was not worth more than $24 a share. The net quick assets value was a proper measure to use in determining the value of the stock. In 1930 it was necessary also to take into account that we were on the verge of a very serious depression in this country. The net earnings of the defendant company in 1929 had been only $2,000. The company's newspaper circulation in 1930 was only slightly over 24,000. The newspaper was issued only once a week. Another Negro newspaper, currently published in New York City, which had a somewhat larger circulation in 1930, namely, approximately 26,000, could have been purchased at that time for $25,000. Other shares of the defendant company had been sold, at or about the same time that the plaintiff sold his shares, for the same price, i. e., $30, with respect to which no complaint by the sellers was made as to inadequacy of price; and also the total dividends paid on the Afro-American Company stock in 1930 were only $1.24 a share.

The foregoing conclusions are borne out by the testimony of a local investment counsellor who testified on behalf of defendants and whose testimony has not been, we find, in any way impeached or weakened by any of the testimony introduced on behalf of plaintiff. On this question of the adequacy of the consideration paid for his stock, plaintiff introduced two witnesses, one of them a Baltimore certified public accountant who had been employed by plaintiff to examine the defendant company's books. He placed a valuation on the stock ranging from $230 to $561 a share in 1930, using the net worth valuation, based purely on book value, in which he placed a valuation of more than $150,000 on the company's physical assets and added thereto $200,000 for good-will and $12,000 for accounts receivable. We conclude that this testimony is not reliable and shows the use of extravagant figures not warranted under the circumstances. Plaintiff also called as a witness on the question of adequacy of consideration the certified public accountant who for a number of years, including 1930 and thereabouts, had had direct charge of auditing the defendant company's books. He rejected the net worth theory as being not at all applicable in determining the fair value of plaintiff's stock sold in 1930, and testified that in his opinion the $30 price was a very fair value of the stock at that time.

Finally, the Court believes that it is apparent from all of the testimony developed on behalf of the plaintiff and by his own testimony that this suit is an afterthought; that it was conceived many years after he knew that he had parted with his stock but at the time he did so the company was not making much money, while in recent years it has been a most profitable business. So the plaintiff concluded that he would try to have his agreement of twenty years ago annulled and thereby obtain a share in the company's recent profits and in the promising outlook for the future. The Court feels that this conclusion is necessary because it is apparent that there is an undercurrent of such motive running throughout the pleadings, as well as the testimony. The amended bill of complaint is replete with extravagant statements which the Court will not now enumerate but which are totally unsupported not merely by the weight of the credible evidence but, for the most part, by *any* evidence, and which could not have honestly been made

if the facts of the case had been honestly and thoroughly reviewed and presented.

It may well be that one can say with reason that the individual defendants should have been more kindly disposed towards plaintiff, should have further endeavored to enable him to retain his stock, and that they should never have consented in 1930 to have purchased it. It may also be said, perhaps, taking everything into consideration, that they might have offered him more for it. But those are questions of policy, questions of opinion and judgment, not questions of law which this Court is called upon to decide This suit is not based, and it could not be successful if based upon such considerations. On the contrary, it is based upon most extravagant charges of gross fraud and deception. The Court finds that when the veil is drawn from across the true facts they completely refute plaintiff's claim. It is true that the testimony disclosed numerous instances where the bookkeeping of the Afro-American Company was not as accurately and completely done as it should have been. For example, an accurate disclosure was never made by entries on the books of the company as to just how and when the individual defendants reimbursed the company for the outlay of $30 a share made to the plaintiff because, pursuant to the agreement, the shares were doubly transferred in that they were paid for by the company, which got them from the plaintiff, and then were transferred to the individual defendants. However, the evidence satisfies the Court that the company was paid. It is uncontradicted that it was paid by deductions from the compensation or salaries paid to these individual defendants, officers of the company. In that respect the Court finds no irregularity, no intentional hiding or destruction of records, no deception or misrepresentation. In short, extravagant charges of misrepresentation and fraud; of taking advantage of a poor, young and inexperienced nephew who was left out in the cold by his uncles who were trying to squeeze him out of earnings of their now very profitable business, are unsupported by the great weight of the credible testimony.

For these reasons the bill of complaint must be dismissed, the plaintiff to pay the costs.